[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a complaint in one count in which the Plaintiff seeks damages for injuries he alleges he suffered while being detained in 1988 at the former Morgan Street Detention Center (MSDC). The defendant State of Connecticut has pled three special defenses as follows: (1) that the plaintiff caused his injuries by his own behavior and conduct; (2) that no award may be made for an amount not requested in the original claim filed with the claims commissioner; (3) that the plaintiff failed to take reasonable action to lessen his alleged damages; the damages were, in fact, enhanced by such failure, and the damages which could have been avoided can be measured with reasonable certainty.
The facts are as follows. The plaintiff Kevin Young was born in Glastonbury, CT on March 8, 1951. He graduated from high school in 1970. He joined the armed forces in 1971 and was discharged the following year. From there he attended Prince Technical School under the G.I. Bill and got certified as a car mechanic in the late 1970's. While attending Prince Tech he worked at Balch Pontiac. The plaintiff was married in 1973 and divorced in 1985. He had two sons now ages 27 and 30 of that union.
The plaintiff started drinking alcohol when he was 14 years old. He drinks vodka, which has no smell. He lived with his mother until he CT Page 6645 married and over the years has lived with her on and off as his drinking became more and more problematic. He did not hold down steady jobs but worked at various places and was often paid under the table.
Over the years plaintiff was in and out of detox centers always slipping back into heavy drinking. His 1988 re-arrest was due to his failure to appear on a drunk driving charge. This being his second one. Two weeks before this November 1988 re-arrest the plaintiff had been hospitalized at St. Francis Hospital to treat his seizures and alcohol abuse. When he was discharged he immediately resumed drinking. He would drink until he passed out and resume when he awakened. His drink of preference was vodka. The day he went to court he sat in his truck and drank one-half bottle of gin. When his public defendant saw him he was shocked at the plaintiff's appearance, so much so, that he called ahead to MSDC to make sure Young was seen in their infirmary.
In the years before the November, 1988 detention at MSDC the plaintiff was in an automobile accident in which he suffered no injuries but he had been drinking; he fell down three stairs and the hospital records showed alcohol was involved. In 1987 he suffered seizures and blackouts and would have no recollections of these blackouts.
Prior to the Morgan Street detention the plaintiff was treated at Highwater, a detox center, for two weeks in 1986. This was followed by a stay at Stonehaven where he went through a 28 day detox program. In the three months before Morgan Street he was involved with the Alcohol Drug Rehabilitation Center (ADRC) and in turn was referred by the center to St. Francis Hospital for detoxification. Upon completing his detoxification program the plaintiff went on a thirteen day drinking binge at the end of which time he presented himself before the Enfield Court on the outstanding re-arrest warrant and other charges. The plaintiff appeared with his public defender and elected a trial by jury. The case was continued to December 1, 1988. The plaintiff was thereafter transported to the MSDC. The Information had an entry under the section captioned "other court action" that the mitt should reflect the defendant may need medical attention.
Upon arriving at the MSDC at about 6:00 p.m. the plaintiff underwent an intake assessment. This was conducted by John Robertson, the physician's assistant. This included a series of questions on alcohol/drug abuse, other medical problems, usually vital signs and pulse, respiration and blood pressure. An outpatient clinical record was prepared by LPN Olivia Greene Resto in which she noted her observations as to the plaintiff. She observed visible shaking; that he was unable to hold a cup of water, and that there were signs of withdrawal. Nurse Resto, based on these observations, initiated the medications called for under the written CT Page 6646 general protocol ordered by Dr. Serafini which the nursing staff would follow. The medications administered at that time included dilantin and vistoril as well as multi-vitamins. There was no medical examination of the plaintiff by either Robertson or Dr. Serafini before the dilantin was administered. Nurse Resto was to contact Dr. Serafini if shakes continued. An 8:30 p.m. entry by Nurse Resto on the outpatient clinical record was that the plaintiff's shakes continued. A call was put through to Dr. Serafini. He did not return the call. Whereupon Robertson told Nurse Resto she could administer the ativan, 2 mg. Instituting ativan was the next step normally in their detox protocol. The ativan after the first dose was to be repeated every 2 to 4 hours.
The plaintiff, on his arrival to MSDC, was placed in Block H where prisoners with medical problems were placed so that they could be watched more closely. This block was closest to the station where guards were on duty 24 hours. Every 15 minutes the guard walks the area. On November 30, 1988 plaintiff was placed in another cell still in H block so that he could have a bottom bunk. Nurse Resto took him into this cell at 9:00 p.m. on November 30th. She told him not to climb up to the 2nd level bunk. Before she could stop him the plaintiff leaped up to the 2nd level bunk and dove off landing on his knees and hands outstretched before him. He did not hit his head on any part of the cell floor or bunk. Nurse Resto was present through the whole incident. She promptly examined him to see if he had any injuries. She found none. At her shift change Resto gave the nurse coming on a full report and left. The distance from the top bunk to the floor was about 5 feet.
On November 30, 1988, the plaintiff was seen by Dr. Serafini. Dr. Serafini determined that it was at this point consistent with protocol to keep the plaintiff on ativan, the 2 milligram level, to be reduced the following day by 50%. The morning of the next day progressive degeneration was observed. It was determined that he was not responding to the medication, and that only so much drug could be given. Preparations were made to transport the plaintiff to Hartford Hospital. This took place within the following two hours. A medical consultant's report prepared by Dr. Serafini went along with him. No mention was made of the leap from bunk incident because no injuries were sustained. Had the plaintiff suffered head injury there would have been evidence of some trauma. Trauma is usually evident by the next day.
Upon arrival at Hartford Hospital the plaintiff was examined. Other than bruises on the knees and arms which were duly noted, there was no mention of any head bruises. Some 3 to 4 days after his admission to the hospital the plaintiff came down with pneumonia and was transferred to intensive care after a problem with intibation. While there he went into a coma which lasted 8 days. CT Page 6647
On the same day of his hospitalization Plaintiff's mother was allowed to see him for 15 minutes. At that time she noticed a bump on plaintiff's left forehead. All he made at this point were muttering sounds which was consistent with the report of the hospital admissions record which noted he was not able to communicate. None of the medical personnel either at MSDC or the Hartford Hospital made note of any bumps on plaintiff's forehead.
The plaintiff was discharged from Hartford Hospital to the Transitional Living Facility at Gaylord Hospital on February 23, 1989. He remained there for 9 months, leaving in November of 1989. While there he received physical therapy and communication therapy.
Following his discharge from Gaylord he moved in with Janice Lablank a nurse and employee of Gaylord. This arrangement lasted one year. During this time he attempted to work, doing two weeks at a time but found he could not lift. For the most part he worked under the table for different garages. He continued to drink.
The plaintiff's Hartford Hospital discharge summary written by Dr. Fredericks, the neurologist plaintiff treated with during his hospitalization at Hartford Hospital, is replete with references to old fractures partially healed, right side weakness of some past duration including an old trauma to the right wrist, old fractures partially healing in the cervical spine at the C6-C7 disk space. There were also cognitive deficits which diminished as his condition improved. In his discharge summary Dr. Fredericks attributes these to falls due to seizures or when under the influence of alcohol or to "trauma in the recent past." In his addendum to the discharge summary dated February 23, 1989 Dr. Fredericks added that Kevin Young's mother indicated to him that the correctional unit had written a letter to Kevin's lawyer indicating he had fallen out of a top bunk. Knowing only this about the incident Dr. Fredericks adds in the addendum the following statement: "I assume this was the cause of the traumatic intra cerebral hemorrhage and the fracture dislocation of the cervical spine." He goes on to say. "I also did not emphasize in the discharge summary, that he suffered a degree of a toxic encephalopathy during his early care in the hospital around the time of intibation. One could not rule out some form of a medical encephalopathy, as a result of previous alcohol excess and DTs."
On page 7 of the discharge summary in reference to finding evidence of a minor right auxiliary nerve lesion, Dr. Fredericks stated it was likely secondary to the apparent trauma some time prior to admission. Perhaps, he wrote the patient had suffered withdrawal seizures prior to his incarceration or had suffered unwitnessed seizures with subsequent trauma CT Page 6648 while in jail.
In 1990 the plaintiff lived at the Veteran's Home and Hospital in Rocky Hill, Connecticut. He left there in May of 1991 to enter Elmcrest where he was treated until August 1991 for alcoholism and anxiety. Between August, 1991 and June, 1992 he had seven admissions to the Veteran's Hospital in Newington, Connecticut for treatment of his alcoholism, anxiety and pain. The plaintiff qualified for Social Security Disability benefits in 1992. He was arrested for drunk driving in 1993 and again in 1996. Plaintiff moved to Florida in 1996. His drinking problem continues to be unresolved. He has had two six month periods when, as he described it, he was clean. He admits to binge drinking over the years when he drinks to blackout and doesn't remember anything that happens to him.
This court has heard testimony and read reports of both plaintiffs and defendant's experts as to the standard of care in facilities such as MSDC when dealing with prisoners in various stages of alcohol withdrawal, as well as medical experts dealing with the affects of the "leap from bunk" incident while the plaintiff was incarcerated at MSDC and finally these medical experts opining on the effect of the plaintiff's excessive drinking for a period of over twenty years. This drinking consisted of binge drinking to blackout, which at times included seizures. Over these years there is a medical history of old and healing fractures.
The issue of whether the care provided the plaintiff at MSDC met the "standard of care" for treatment of alcohol withdrawal was answered affirmatively by Dr. Blanchette. He termed the plaintiff's treatment appropriate. According to Dr. Blanchette it makes a difference when the treatment takes place in jail rather than an outpatient clinic. In jail he can be more directly observed and treatment capabilities are greater. Dr. Blanchette found the facilities at MSDC facilitated that care. Dr. Silverman the plaintiff's expert would have had the plaintiff transferred to the Hartford Hospital as soon as he arrived at MSDC and his "visible shakes" observed and attributed to alcohol withdrawal. The plaintiff was placed on dilantin, vistoril, multi-vitamin and thiamine. In Dr. Blanchette's opinion had the plaintiff been hospitalized that first evening there would not have been enough time to see if he would respond. Dr. Silverman's opinion was not based on what would be needed in a detention center with a staffed medical unit able to medicate and put the patient on close watch as was done in the instant case. Dr. Blanchette opined that the care provided the plaintiff at MSDC met the standard of care for the safety of the individual in withdrawal, that is close monitoring. The plaintiff was put in an area where he was more closely observed; an officer was right there 24 hours a day; he would be able to contact someone quickly if anything happened and in fact Nurse Resto was in the cell with the plaintiff when contrary to her order to CT Page 6649 get into the bottom bunk he hopped up to the upper bunk and leapt down. She immediately examined him and determined there were no injuries.
In Dr. Blanchette's opinion the plaintiff probably suffered some brain trauma in the 2-1/2 weeks between his discharge from St. Francis Hospital and his incarceration at MSDC. In those 2-1/2 weeks he drank non-stop. When he left St. Francis Hospital an MRI taken there showed no blood in the brain, no brain damage. He then went on a drinking binge where he would black out and not remember anything that happened to him. Two and a half weeks later he went to MSDC where he dove off a top bunk. There were marks on his knees and arm but no visible injury to the head. One would have expected to see by the next day some swelling. Hartford Hospital found none either. These are the facts upon which Dr. Blanchette based his opinion of the probability that in the 2-1/2 weeks between leaving St. Francis Hospital and being incarcerated at MSDC the plaintiff suffered some brain trauma and that the signs and symptoms of these hematomas and brain trauma were masked entirely by either his acute intoxication status initially, and/or subsequently by his alcohol withdrawal status.
Dr. Blanchette also notes that the plaintiff had a right knee injury described on the medical intake form completed on his admission to MSDC which he states was almost certainly a result of trauma, which took place before his incarceration.
Dr. Fredericks concluded that the fracture of Plaintiff's cervical spine at the C6-C7 level caused impairment of the right arm and shoulder and gave a 5% partial permanent rating to the right arm. In the medical records of the Hartford Hospital there is reference to right side weakness which caused lifting problems for the plaintiff when he had worked as an automobile mechanic. Dr. Fredericks in his summary referred to an old fracture partially healing in the cervical spine at the C6-C7 disk space. Thereafter when he learned from plaintiff's mother about the fall from the top bunk he attributed these injuries to that fall. Dr. Fredericks had no opinion as to any speech, reading or affect deficits when he saw the plaintiff in early 1989. Defendant's I.M.E. neurologist, Dr. Benson's testimony was that he would attribute some of the plaintiff's impairment to the fall. However, Dr. Benson's testimony suffers from the same weakness as that of Dr. Fredericks. Neither were privy to the testimony of Nurse Resto who was there with the plaintiff and witnessed the fall. Her testimony which this court has found very credible was that he did not hit his head and in fact leaped down onto his knees and outstretched hands; that she promptly examined him and found no injuries.
Dr. Benson in assessing plaintiff's employability concluded that the CT Page 6650 plaintiff could be employed in a number of positions. He termed the plaintiff quite competent and employable; that in the two 6 month periods that the plaintiff had gone off drinking he performed well; that his frustration toleration was good; and that the plaintiff was functional. Dr. Benson found no specific language problems; that the plaintiff was able to do simple calculations; and that his higher reasoning skills were fairly good. There was an instability in his gait due to his chronic alcoholism. Dr. Benson was aware of the plaintiff's history of severe alcoholism both from the records he had available to him and from the plaintiff himself.
Dr. Benson found on his neurological examination that there was convincing evidence of the effects of chronic alcoholism intake, specifically lower extremity atoxia, which would not be explained by his focal brain injuries, and that the same is true of his sensory deficits in his distal lower extremities, which are more likely on the basis of alcohol-induced peripheral neuropathy.
Dr. Benson's examination which was conducted on January 30, 2001, found that the plaintiff presented somewhat better cognitively than the MRI from 1996 appeared and that given his early neurologic impairments stemming from his 1988 head injury, has made a memorable recovery. Though he had not worked in several years, Dr. Benson found that at this juncture he appeared to be capable of employment since his lower extremity atoxia and sensory deficiencies, and mild cognitive problems would not prevent him from working in some capacity. However, this would involve abstention from alcohol and good nutrition.
The plaintiff began receiving social security disability benefits in 1992. He moved to Florida in 1996 where he had two 6 month periods when he was clean of alcohol. This was in 1997 and in the last 6 months of 1998. Since receiving social security benefits he has done some work under the table. These have involved electrical work and carpentry and did not go for full days. The plaintiff admits to slipping back into drinking some eight months ago.
This court concludes from the facts found that the care received by the Plaintiff in the MSDC was well within the standard of care required for a person in alcohol withdrawal.
This court concludes from the facts found that the plaintiff has failed to prove that the plaintiff sustained any injuries attributable to his leaping from the top bunk of his cell at MSDC.
This court concludes from the facts found that the plaintiff's excessive drinking was the reason for his inability to hold down steady CT Page 6651 work. His various weaknesses are attributed in part to early developmental problems and subsequently to the affects of excessive alcohol intake on his person over a period of twenty years. This included binge drinking to blackout, multiple seizures, old fractures, healing fractures, short term memory deficits, and gait problems.
In summary the court finds that the plaintiff Kevin Young has failed to prove by a preponderance of the evidence his claim of breach of the standard of care by MSDC and that he sustained head injuries when he leaped from the top bunk in his cell at MSDC which injuries resulted in a diminished capacity to engage in gainful employment.
Judgment may enter in favor of the defendant State of Connecticut.
Hennessey, J.